UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25mj02072 Goodman

FILED BY___TS___D.C.
Jan 14, 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

UNITED STATES OF AMERICA

v.

EVAN PUCKETT,
TRE'VON ANTHONY NEAL,
ZACARY BRIGGS, AND
AARON HAMMOND,

    Defendants.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?   No

2. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?   No

3. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?   No

4. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024?   No

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: /s/ Lauren A. Astigarraga
    Lauren A. Astigarraga
    Assistant United States Attorney
    FL Bar No. 0119473
    99 N.E. 4th Street, Suite 700
    Miami, FL 33132
    Telephone (305) 961-9105
    Lauren.Astigarraga@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America <br> v. <br> EVAN PUCKETT, TRE'VON ANTHONY NEAL, ZACARY BRIGGS, AND AARON HAMMOND, <br><br> *Defendants.* | Case No. 25mj02072 Goodman |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 6-13, 2025 in the county of Miami-Dade in the Southern District of Florida, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1201(c) | Kidnapping Conspiracy |
| 18 U.S.C. § 1201(a) and (d) | Attempted Kidnapping |
| 18 U.S.C. § 1951(a) | Hobbs Act Robbery Conspiracy |
| 18 U.S.C. § 1951(a) | Attempted Hobbs Act Extortion |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

*Complainant's signature*

Ryan Dreibelbis, Special Agent FBI
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time.

Date: 1/14/2025

*Judge's signature*

City and state: Miami, Florida

Hon. Jonathan Goodman, Chief United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Ryan Dreibelbis, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the Violent Crimes and Fugitive Task Force, in the Miami Division. My current duties involve the investigation of a variety of violations of federal offenses, including bank robberies, Hobbs Act robberies, extortion, murder for hire, kidnapping, and other violations of federal law. I have been a Special Agent with the FBI since February 2018 and have been assigned to the Miami Division since May 2019.

2. This affidavit is submitted in support of a criminal complaint charging Evan Puckett ("PUCKETT"); Tre'von Anthony Neal ("NEAL"); Zacary Briggs ("BRIGGS"); and Aaron Hammond ("HAMMOND") (collectively, referred to as the "KIDNAPPING GROUP") with kidnapping conspiracy, in violation of Title 18, United States Code, Section 1201(c); attempted kidnapping, in violation of Title 18, United States Code, Section 1201(d); Hobbs Act Robbery conspiracy, in violation of Title 18, United States Code, Section 1951(a); and attempted Hobbs Act extortion, in violation of Title 18, United States Code, Section 1951(a).

3. The facts and information contained in this affidavit are based on my personal knowledge and observations, as well as information received in my official capacity from other individuals, including other law enforcement officers involved in this investigation. This affidavit does not include every fact known to me about this investigation, but rather includes only those facts sufficient to establish probable cause.

**FACTUAL BACKGROUND**

**THE COMMUNICATIONS BETWEEN THE KIDNAPPING GROUP**

4. On or about January 6, 2025, a confidential source ("CS-1") approached law enforcement with information that sometime within the next two weeks, an individual he referred to as "JACK" would assemble a group of people to kidnap a jeweler who worked out of the Seybold Building, in Miami, Florida ("VICTIM"). According to CS-1, JACK was in contact with VICTIM online and was seeking to exchange a large amount of cryptocurrency for cash. Some members of the KIDNAPPING GROUP ultimately decided they would kidnap VICTIM on or about January 13, 2025, at approximately 10:00 or 11:00 a.m.

5. Beginning on or about January 6, 2025, CS-1 had conversations, both verbal and through messenger services with JACK about the upcoming kidnapping. On or about January 7, 2025, CS-1 and JACK spoke about the upcoming kidnapping plot. JACK explained to CS-1 that he would put him in a group chat with the "goons," which is how JACK referred to the members of the KIDNAPPING GROUP. JACK also sent a screenshot of VICTIM's cryptocurrency wallet, which showed VICTIM possessed almost approximately $2 million dollars in cryptocurrency.

6. In the following days JACK started a group chat on the Telegram chat application entitled "Play." In my training and experience and based on the context of the conversation, I know that the term "play" can be a reference to a criminal plan or plot. The members of the "Play" Telegram group chat included the following Telegram usernames:

    a. "@Dot Dot Dot, @woreow ("DOT");

    b. "@bigswipey21" ("SWIPEY");

    c. "A" ("TIM"); and

    d. "Jack" ("JACK").

7.     On or about January 9, 2025, in the "Play" group chat, JACK called attention to the other participants and said "[y]oo. This my partner Tim," to which "A" responded "[w]hat's good guys . . . Big money easy." DOT then responded "alr[eady] heard abt it. Jack mentioned. We ready." JACK then replied "[s]o let's talk ab setting it up."

8.     Later in the conversation JACK stated "so I told them not to hurt or do shi to him. We just need to get him." Based on the context of the conversation, law enforcement believes "him" is a reference to VICTIM. DOT then stated "we are ready, we just need some money to get tools and everything ready . . . 3.5k should be good to get everything started, we'll go grab bullets and have the people ready." TIM later replied to the group that he "can't float 3.5k," but could float the "rental car money." DOT then stated they would not be "putting up his own money for shii before the play . . . You guys talking about a play that I don't even know that is 100%." Ultimately, the members of the KIDNAPPING GROUP agreed that JACK and TIM would provide the other members of the group $3,500 prior to the kidnapping.

9.     Later in the conversation, DOT messaged "Im holding him until we get paid," to which TIM replied "[JACK] or me will do the crypto payment right away after." Your affiant understands that in this exchange, DOT was declaring his intention to hold VICTIM captive until VICTIM had paid the KIDNAPPING GROUP, and that TIM was assuring DOT that he or JACK would collect the crypto ransom payment promptly, once the KIDNAPPING GROUP had VICTIM in its custody.

10.    At some point the members of the KIDNAPPING GROUP began to discuss the need to secure a vehicle for the kidnapping of VICTIM. It was ultimately decided that TIM would provide a vehicle for the kidnapping. DOT later stated that they would be carrying firearms, including Mac-10s and .223 assault style rifles for the kidnapping.

11. CS-1 told law enforcement that members of the KIDNAPPING GROUP asked him to provide them with a vehicle to use for the kidnapping prior to Monday, January 13, 2025, the anticipated date of the kidnapping, so they could drive around the area where the kidnapping would occur and scope it out beforehand.

### Delivery of the KIDNAPPING VEHICLE to PUCKETT

12. On January 12, 2025, TIM told the members of the KIDNAPPING GROUP that he would send his associate "D," a "tall black guy" to deliver a car that they could use for the kidnapping. In the group chat, TIM and JACK arranged for SWIPEY to meet "D" at an agreed upon location near or around Palm Beach County, Florida, to pick up the car.

13. Law enforcement obtained authorization for a T-3 wire interception, which permitted it to outfit a black 2023 Chevy Tahoe, Florida license plate NFPN98, Vehicle Identification Number 1GNSCNKD1PR274057 (the "KIDNAPPING VEHICLE") with an audio and video recording and GPS tracking. *See* Case No. 25-WT-20001-SEALED.

14. On or about January 12, 2025, an undercover agent ("UC") purporting to be "D," drove to the agreed upon meet up spot in the KIDNAPPING VEHICLE. PUCKETT arrived at the agreed upon location to pick up the KIDNAPPING VEHICLE and met with the UC. This meeting was audio and video recorded.

### The Meeting Between PUCKETT and the UC

15. The UC asked PUCKETT whether he was there to meet with him and PUCKETT confirmed that he was. The UC asked PUCKETT whether he just needed the KIDNAPPING VEHICLE or whether he still needed the money. PUCKETT indicated that he still needed the money for other stuff. The UC told PUCKETT that he was leaving the keys and the money inside the KIDNAPPING VEHICLE. The UC then left the scene and departed in a nearby car.

16.     The video and audio equipment inside the KIDNAPPING VEHICLE later captured PUCKETT enter the KIDNAPPING VEHICLE and appear to be checking out the car. PUCKETT then called another person on a cell phone, believed to be JACK, and began to discuss the condition of the vehicle. Following PUCKETT's inspection of the KIDNAPPING VEHICLE, he then returned to the car that he arrived in ("PUCKETT'S VEHICLE") and left the KIDNAPPING VEHICLE where it was parked. PUCKETT appeared to be the only person who arrived at the meeting location to retrieve the KIDNAPPING VEHICLE from the UC.

17.     After PUCKETT met with the UC, SWIPEY messaged the KIDNAPPING GROUP in the Play group chat stating, "Big D was cool." Thus, law enforcement believes that PUCKETT is utilizing the SWIPEY username on Telegram.

18.     PUCKETT later got the assistance of a young female associate to move the KIDNAPPING VEHICLE from its original location to another residence located in Broward County, Florida. When PUCKETT arrived at the KIDNAPPING VEHICLE the recording equipment captured him stating "Oh, he's not getting this back," which based on the context of the conversation appeared to be a reference to returning the KIDNAPPING VEHICLE.

## The Day of the Planned Kidnapping

19.     Law enforcement has been conducting surveillance of PUCKETT since his arrival to the meeting location to pick up the KIDNAPPING VEHICLE and has maintained a visual of PUCKETT's person or the location he was inside of since that time and through the application of this warrant. Law enforcement identified a phone number ending in 9112 ("PUCKETT's PHONE") as a number believed to being utilized by PUCKETT. Law enforcement served an emergency disclosure request ("EDR") on PUCKETT'S PHONE and began receiving GPS pings related to the location of the device and call detail records.

20. The records obtained through the EDR demonstrated that from on or about January 12, 2025, through and including January 13, 2025, PUCKETT'S PHONE was in continuous communication with a phone number ending in 2565 ("NEAL'S PHONE"). Subscriber records demonstrated that NEAL'S PHONE was subscribed to NEAL.

21. CS-1 told law enforcement that some of the members of the KIDNAPPING GROUP told him that NEAL would be traveling down from the Central Florida to the Southern District of Florida to participate in the kidnapping. In a recorded call between a person believed to be PUCKETT, JACK, and CS-1, PUCKETT stated that that NEAL would be the passenger of the KIDNAPPING VEHICLE during the kidnapping.

22. Law enforcement served an emergency disclosure request on NEAL'S PHONE and began receiving GPS pings related to the location of the device. On or about January 13, 2025, the GPS pings related to the location of NEAL'S PHONE was consistent with the movements described by CS-1 of NEAL's anticipated travel from Central Florida to the Southern District of Florida.

23. On or about January 13, 2025, PUCKETT contacted HAMMOND via Facebook Messenger looking for "T," who law enforcement understands is a reference to NEAL. PUCKETT later told HAMMOND that he would still "get the car" even if the "play" did not go through.

24. On that same date, on a recorded call, PUCKETT told JACK and the CS-1 that he had a "convoy of [N-words] doing this shit for nothing," and that these people were "coming" to PUCKETT right now. JACK told PUCKETT that he needed to make sure the VICTIM could not escape.

25. On or about January 13, 2025, PUCKETT procured two firearms, a handgun and an AR-Style pistol. PUCKETT sent a photograph of the firearms to the KIDNAPPING GROUP.

26. That same date, NEAL traveled from Central Florida to the Southern District of Florida with HAMMOND and BRIGGS to the location that the KIDNAPPING VEHICLE was parked in Broward, Florida. PUCKETT was waiting in the area at the time that NEAL, HAMMOND and BRIGGS arrived. As one of the men opened the driver's side door of the KIDNAPPING VEHICLE, and the other men moved towards the vehicle, law enforcement approached the car and ordered all four men to the ground. PUCKETT, HAMMOND, BRIGGS attempted to flee but were quickly apprehended. NEAL fled on foot and evaded law enforcement for a short period of time before he was captured and apprehended at a nearby business.

27. In a recorded call, three members of the KIDNAPPING GROUP began to discuss the kidnapping plot. One the call, a male voice can be heard saying that "one knock," "one good bop" should do it," but that they didn't want to give the VICTIM "brain damage." Another male voice can then be heard saying "I don't want this [n-word] to stab me or f*cking shoot me," to which a third male voice then replies "Tre'von, I would kill that nigger dawg."

### PUCKETT'S Post-*Miranda* Statement

28. PUCKETT waived *Miranda* and gave a statement to law enforcement. This statement was audio and video recorded. PUCKETT admitted to law enforcement that he was in communication with JACK and that the KIDNAPPING GROUP intended to rob the VICTIM for his cryptocurrency. PUCKETT admitted that he brought the guns the group members would possess during the robbery; however, he claimed that he intended to use them only in the event that he needed to defend himself.

### NEAL'S Post-*Miranda* Statement

29. NEAL waived *Miranda* and gave a statement to law enforcement. This statement was audio and video recorded. NEAL told law enforcement that he was supposed to act as

"security" for the KIDNAPPING GROUP and would protect the crew if the VICTIM tried to defend himself with a weapon. NEAL had a knife on his person at the time he was taken into custody, but he told law enforcement that he did not intend to use the knife in the kidnapping. NEAL also told law enforcement that he had changed his mind about participating in the robbery and wanted to leave from the location of the KIDNAPPING VEHICLE and just drive back home. NEAL claimed that BRIGGS was on a call with the KIDNAPPING GROUP while they drove from Ocala to Davie.

### BRIGGS' Post-*Miranda* Statement

30. BRIGGS waived *Miranda* and gave a statement to law enforcement. This statement was audio and video recorded. BRIGGS initially told law enforcement that NEAL hired him to drive him around and that he was going to get paid $500 a day. BRIGGS then admitted that he had travelled to south Florida with NEAL, but he claimed he was asleep during the trip. BRIGGS also claimed that he believed NEAL used his phone while he was sleeping during the drive down, and that once the KIDNAPPING GROUP arrived in the Southern District of Florida, PUCKETT also might have used his phone. BRIGGS told law enforcement that PUCKETT is known to scam people for cryptocurrency. BRIGGS eventually admitted he was aware that the KIDNAPPING GROUP was driving down to the Sothern District of Florida to participate in the kidnapping and robbery of VICTIM, but he only agreed to act as the "driver," and he did not plan on getting involved in the violence against VICTIM. BRIGGS also told law enforcement that if anyone threatened his safety during the robbery, he would have run them over with the truck. BRIGGS was supposed to be paid $500 for his role in the robbery. BRIGGS told law enforcement that the plan was for PUCKETT to meet with the VICTIM and pretend that he was going to give him a couple of watches in exchange for cryptocurrency, but that he was not really going to give the VICTIM any watches.

### HAMMOND'S Post-*Miranda* Statement

31. HAMMOND waived *Miranda* and gave a statement to law enforcement. This statement was audio and video recorded. HAMMOND told law enforcement that he traveled down to the Southern District of Florida with NEAL and BRIGGS to participate in the robbery of a "jeweler." HAMMOND admitted that the KIDNAPPING GROUP's plan was to lure the jeweler to the car, rob him and then let him go. HAMMOND told law enforcement he was supposed to be the "jump out guy," and that this meant HAMMOND was going to bonk VICTIM on the head and put him in the KIDNAPPING VEHICLE. HAMMOND said when he arrived at KIDNAPPING VEHICLE's location in Broward County, Florida, he saw the rifle in the vehicle and became worried because he was on "probation."

### CONCLUSION

32. Based on the foregoing, I respectfully submit that there is probable cause to support a criminal complaint charging PUCKETT; NEAL; BRIGGS; and HAMMOND with kidnapping conspiracy, in violation of Title 18, United States Code, Section 1201(c); attempted kidnapping, in violation of Title 18, United States Code, Section 1201(d); Hobbs Act Robbery conspiracy, in violation of Title 18, United States Code, Section 1951(a); and attempted Hobbs Act extortion, in violation of Title 18, United States Code, Section 1951(a).

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
RYAN DREIBELBIS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time this __14th__ day of January 2025.

_____
HONORABLE JONATHAN GOODMAN
CHIEF UNITED STATES MAGISTRATE JUDGE